IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:23-cv-00457-GNS

KALEB RUSSELL          PLAINTIFF

v.     **PLAINTIFF'S FIRST AMENDED COMPLAINT**
*Trial by Jury Demanded.*

BELLARMINE UNIVERSITY INCORPORATED        DEFENDANT
2001 NEWBURG ROAD
LOUISVILLE, KENTUCKY 40205

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff, KALEB RUSSELL ("Kaleb" or "Plaintiff"), by and through counsel, brings this civil action against Defendant, BELLARMINE UNIVERSITY INCORPORATED ("Bellarmine" or "Defendant"), under the Kentucky Civil Rights Act, KRS 344.120 ("KCRA"), Title III of the Americans with Disabilities Act ("ADA:"), and Section 504 of the Rehabilitation Act of 1974 ("RA").

## **PARTIES**

1. Plaintiff is a former student at Bellarmine University.

2. Defendant is a non-profit Kentucky Corporation domiciled in the Commonwealth of Kentucky, with the location of its principal office listed as 2001 Newburg Road, Louisville, Kentucky 40205. Defendant is a direct recipient of substantial government funds and, accordingly, is directly, or at least indirectly, supported by government funds.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

4. Venue is proper in this Court.

## FACTUAL ALLEGATIONS

5. Kaleb was diagnosed with Tourette Syndrome when he was seven years old.

6. Throughout his life, Kaleb has dealt with a range of involuntary tics brought on by Tourette Syndrome. These tics have included a shoulder movement that occurred with such frequency that it caused Kaleb to experience nerve damage and muscle atrophy, a tic which caused Kaleb to wrench his neck to the point that it caused a misalignment in his spine, and a teeth grinding tic that still forces Kaleb to wear thick retainers to protect his teeth.

7. When Kaleb reached seventh grade, he began to develop tics that manifested in the form of coprolalia.

8. Coprolalia is the term used to describe the involuntary outburst of obscene words or socially inappropriate and derogatory remarks, including, for example, references to genitals, excrement, sexual acts, an even racial or ethnic slurs. Coprolalia is most often expressed as a single word but may involve complex phrases. Stress, whether emotional or physical, fatigue, and excitement (positive or negative) are associated with exacerbating or worsening coprolalia and tics.

9. In his seventh-grade year, Kaleb developed a coprolalia tic that involved

vocalization of the N-word. Obviously, this particular tic is highly distressing to Kaleb, and he has worked diligently to develop strategies to mitigate this vocal tic.

10. To cope with his tics manifesting in the form of coprolalia, Kaleb began Cognitive Behavioral Interventional Therapy ("CBIT"). Through CBIT, Kaleb learned to identify urges and impulses that manifested in coprolalia and then express the tic in a less noticeable way. However, the constant vigilance required to identify these urges and impulses and then redirect them is mentally exhausting and Kaleb is only able to "control" his tics in this manner for limited periods of time.

11. In the fall of 2022, Kaleb began his college career at Bellarmine University.

12. In addition to pursuing his education at Bellarmine, Kaleb is also a member of the University's lacrosse team.

13. During the first few months of his first semester at Bellarmine, Kaleb was adjusting well to college life. Early in the semester, Kaleb approached his Lacrosse teammates and explained to them that he had Tourette Syndrome and that his tics sometimes manifested in vocalization of inappropriate words or phrases, including the N-word. Kaleb's teammates were understanding and continued to support him at Bellarmine.

14. As the end of the fall semester neared, Kaleb found that the stress of college life, division one athletics, and his quickly approaching finals began to mount. As stated above, stress tends to exacerbate Kaleb's tics and, as December approached, Kaleb's tics, particularly his vocal tics, were becoming very difficult

to suppress. Specifically, Kaleb's coprolalia tics began to worsen.

15. To mitigate his coprolalia and involuntary vocalization of the N-word, Kaleb began to write down in a notebook the words that he felt an impulse or urge to vocalize. This strategy, developed as part of his CBIT training, helped Kaleb avoid vocalizing inappropriate words in class and other social settings.

16. Unfortunately, this coping mechanism quickly developed into its own compulsive tic called coprographia – the involuntarily making of vulgar writings or drawings.

17. Shortly after midnight on December 2, 2022, one of Kaleb's friends, Josh Seipp, wanted to meet up with another friend, Hadlee Holland. Hadlee invited Kaleb and Josh to the room of her friend Bronwyn Robinson. Bronwyn's roommate, Alise Fenwick, was gone for the night.

18. Ultimately, Kaleb, Josh, and another friend, Nathan Chirillo, met Hadlee and Bronwyn in Bronwyn's room. When the three arrived at Bronwyn's room, Hadlee and Josh immediately began a conversation and Bronwyn, Nathan, and Kaleb started playing a game of "keep away" with a soccer ball.

19. While playing the game, Kaleb tripped over Bronwyn's foot and inadvertently broke the frame of a shoe rack. Kaleb picked up the shoes he knocked over, but, in the moment, did not realize the shoe rack was broken. A few minutes later, Nathan left the room and Bronwyn began watching a movie with Hadlee and Josh.

20. When he initially entered the room, Kaleb noted that there was a dry erase board

on the wall. While the movie played, Kaleb noticed that his vocal tics were beginning to become worse, so, to cope with the tic and avoid disturbing the movie, Kaleb began to utilize the dry erase board to write down his coprolalia tics rather than vocalize them. Some of what Kaleb wrote on the board included the N-word.

21. A short time later, Bronwyn ushered Kaleb, Josh and Hadlee from the room because another one of her friends was coming over to visit, so the three abruptly left. Because the group was watching a movie, Bronwyn's room had been dark and while leaving the room, Kaleb did not realize that he had failed to erase some of the words he had written on the whiteboard.

22. Later that day, December 2, 2022, Kaleb was called to the office of Dr. Leslie Maxie, Bellarmine's Dean of Students. When he arrived in her office, Dr. Maxie informed Kaleb that racial slurs had been written on the dry erase board in the room of Bronwyn and Alise and asked Kaleb if he knew who had written the slurs. It was at this point that Kaleb first learned that Bronwyn's roommate was Black.

23. Kaleb immediately became sick to his stomach and was humiliated that his tics had offended another person. In a moment of panic and humiliation, Kaleb told Dr. Maxie that he did not know who had written the slurs on the dry erase board. Kaleb was dismissed from Dr. Maxie's office.

24. Immediately upon leaving the office, Kaleb emailed Dr. Maxie and told her that he needed to come back right away.

5

25. When he arrived back at her office, Kaleb told Dr. Maxie that he had Tourette Syndrome and explained his tics. Kaleb went on to explain that one of the methods he had been using recently to cope with his tics was writing his vocal tics down rather than actually vocalizing them.

26. Kaleb went on to explain that this was why he had written the slur in question on the dry erase board and that, unfortunately, he had failed to erase them during his abrupt exit from Bronwyn's room the night before.

27. Kaleb even provided Dr. Maxie with a piece of paper that he still had in a notebook that showed that he was writing down obscenities as a coping mechanism.

28. Kaleb also informed Dr. Maxie of the conversations he had at the beginning of the semester with two of his Black lacrosse teammates, Jaden Wilkins and Tayo Oladunmoye, in which he told them he had Tourette Syndrome, explained what coprolalia is, and warned them that the N-word was one of his vocal tics.

29. Dr. Maxie then told Kaleb that she was going to speak with Krista Schutz-Hampton, Director of Bellarmine's Accessibility Resource Center, to confirm that Kaleb did have Tourette Syndrome and that it was documented upon his arrival at Bellarmine.

30. After this initial meeting with Dr. Maxie, Kaleb asked Bronwyn if she would provide him with Alise's phone number so he could apologize for the words left on the dry erase board and explain to her how his Tourette Syndrome caused coprolalia and how he used writing down his vocal tics as a coping mechanism.

31. Alise originally accepted Kaleb's offer to talk, however she ultimately declined to speak with Kaleb.

32. In lieu of speaking directly with Alise, Kaleb sent her a text message apologizing and explaining that he had Tourette Syndrome and what had happened in her room.

33. Shortly after texting with Alise, Kaleb began seeing posts on a social media site called Yik Yak that referenced him and this incident. The posts identified Kaleb by name and stated that he was a racist.

34. On December 5, 2022, Kaleb received an email from Dr. Maxie that informed him that there would be a Student Conduct Hearing on December 8, 2022, to address the incident that occurred on December 2.

35. The Student Conduct Hearing occurred on December 8, 2022, as scheduled. During the December 8 Hearing Kaleb was charged with the following Code of Student Conduct violations:

    1. Code of Student Conduct #4: Violation of University policies including the residence hall contract; Residence Hall Visitation.

    2. Code of Student Conduct #5: Intentionally or recklessly destroying, altering, or damaging University property or the property of others

    3. Code of Student Conduct #14: Conduct which is disorderly, obscene, lewd, indecent, and objectively offensive. This includes, but is not limited to, physical, electronic, or verbal misconduct.

36. On December 13, 2022, Kaleb received a letter from Dr. Maxie detailing the outcome of the Student Conduct Hearing which had found him responsible for

each of the above violations.

37. The outcome of the Student Conduct Hearing resulted in Kaleb receiving discipline from Bellarmine which included a semester long ban from campus housing.

## *APPEAL OF STUDENT CONDUCT HEARING*

38. On January 3, 2023, pursuant to the 2022-2023 Bellarmine University Student Handbook, Kaleb appealed the results of the Student Conduct Hearing on two bases: 1. The proportionality of the sanctions; and 2. The discriminatory basis of the discipline.

## *KALEB IS FORCED TO TAKE A HIATUS FROM BELLARMINE*

39. On January 4, 2023, Kaleb after consulting with his family and much consideration, decided he had no choice but to withdraw from Bellarmine for the 2023 Spring Semester.

40. In addition to Bellarmine's discriminatory handling of this process, Kaleb had been labeled as a "racist" on social media.

41. Kaleb raised his concerns regarding the social media postings to the school, but Dr. Maxie and Patrick Englert informed him that Bellarmine could do nothing with respect to the posts made on social media. This statement contradicts Bellarmine's own written social media policy which states:

> The policies of Bellarmine University are written and interpreted broadly to include online and cyber manifestations of any of the behaviors prohibited below, when those behaviors occur in or have an effect on Bellarmine University's education program and activities or use Bellarmine University networks, technology, or equipment.
>
> *While Bellarmine University may not control websites, social media, and other venues in which harassing communications are made, when such communications are reported to Bellarmine University, it will engage in a variety of means to address and mitigate the effects.*
>
> Members of the community are encouraged to be good digital citizens and to refrain from online misconduct, such as submitting to anonymous gossip sites, sharing inappropriate content via Snaps or other social media, unwelcome sexting, revenge porn, breaches of privacy, or otherwise using the ease of transmission and/or anonymity of the Internet or other technology to harm another member of Bellarmine University community.

(See 2022-2023 Bellarmine University Student Handbook, p. 65-66).

42. Despite its clear policy regarding online harassment and misconduct, Bellarmine took absolutely no steps to address the harassing social media posts being made about Kaleb.

43. Additionally, Bellarmine's decision to ban Kaleb from student housing based on the manifestations of his TS, placed Kaleb in the impossible position of finding off campus housing on extremely short notice.

44. However, in reality, off campus housing was never an option for Kaleb due to significant expense of find and leasing an apartment.

9

45. Further, most reputable rental options would have required that Kaleb agree to a lease term that was significantly longer that the spring semester at Bellarmine.

46. This financial burden combined with the timing of Bellarmine Student Conduct Appeal process placed Kaleb in a difficult situation.

47. Specifically, if Kaleb remained enrolled at Bellarmine as a full-time student past January 4, 2023, and then elected to withdraw or go on hiatus at some time after that date, he would lose at least 20% of that semester's tuition.

48. Because Bellarmine was not required to rule on Kaleb's January 3, 2023 Student Conduct Hearing Appeal until January 6, 2023, Kaleb elected to go on hiatus on January 4. If the appeal was successful, Kaleb intended to reenroll on fulltime classes at Bellarmine prior to the January 11, 2023 deadline.

49. However, Kaleb discovered on January 6, 2023 that, in violation of its own policy, Bellarmine was refusing to rule on the Student Conduct Appeal simply because Kaleb had elected to go on hiatus status.

50. Kaleb did not make the decision to withdraw from Bellarmine lightly, but given the circumstances of his suspension from student housing on campus and Bellarmine's handling of the entire situation, Kaleb felt he had no choice but to leave campus.

*BELLARMINE DROPS KALEB'S STUDENT CONDUCT HEARING APPEAL*

51. On January 6, 2023, directly on the heels of Kaleb's decision to withdraw for the semester, Bellarmine made the decision to stay any action on the appeal of the Student Conduct Hearing Kaleb filed on January 3, 2023.

52. This action was in contravention of Bellarmine's own policies as explicitly defined in its Student Handbook. (See 2022-2023 Bellarmine University Student Handbook, p. 38-40).

## CAUSES OF ACTION

*COUNT ONE: VIOLATION OF KRS 344.120:*
*DENIAL OF PUBLIC ACCOMMODATION ON THE BASIS OF DISABILITY*

53. Plaintiff realleges and incorporates by reference the allegations set forth above in the preceding paragraphs.

54. Plaintiff has Tourette Syndrome.

55. Plaintiff's TS constitutes a disability as that term is defined in KRS 344.010(4).

56. Defendant is a place of public accommodation as that term is defined in KRS 344.130.

57. Defendant receives significant government funding, including substantial federal grants and financial aid for students. Accordingly, Defendant is a public accommodation supported directly, or at least indirectly, through government funds.

58. Defendant denied Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Bellarmine on the grounds that Plaintiff suffers from TS.

11

59. Because of his disability, Plaintiff has been unable to and continues to be unable to enjoy access to, and the benefits of, the services offered by Bellarmine. Accordingly, Plaintiff has suffered an injury-in-fact due to Defendant's discriminatory policies.

60. Defendant's discriminatory policies violated the KCRA's prohibition of disability discrimination in places of public accommodation.

### *COUNT TWO: VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT*

61. Plaintiff realleges and incorporates by reference the allegations set forth above in the preceding paragraphs.

62. Plaintiff has Tourette Syndrome.

63. Plaintiff's TS constitutes a disability as that term is defined in the ADA.

64. Despite his disability, Plaintiff was qualified to attend Bellarmine University and participate fully in and enjoy access to, and the benefits of, the services offered by Bellarmine.

65. Defendant denied Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Bellarmine on the grounds that Plaintiff suffers from TS.

66. Plaintiff was discriminated against because of his TS when he was not provided with adequate accommodations and denied student housing by Defendant Bellarmine.

67. Defendant's actions are in violation of 42 U.S.C. §12182.

68. Defendant's actions were willful, intentional and done with reckless disregard for Plaintiff's civil rights.

69. Plaintiff has suffered damages as a result of Defendant's unlawful actions.

## *COUNT THREE: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1974*

70. Plaintiff realleges and incorporates by reference the allegations set forth above in the preceding paragraphs.

71. Plaintiff has Tourette Syndrome.

72. Plaintiff's TS constitutes a disability as that term is defined in the Rehabilitation Act.

73. Defendant is a direct recipient of federal funding, including substantial federal grants and financial aid for students.

74. Plaintiff received federal student aid while he attended Bellarmine University to help cover his tuition costs.

75. Despite his disability, Plaintiff was qualified to attend Bellarmine University and participate fully in and enjoy access to, and the benefits of, the services offered by Bellarmine.

76. Defendant denied Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Bellarmine on the grounds that Plaintiff suffers from TS.

77. Plaintiff was discriminated against because of his TS when he was not provided with adequate accommodations and denied student housing by Defendant

Bellarmine.

78. Defendant's actions are in violation of the Rehabilitation Act.

79. Defendant's actions were willful, intentional and done with reckless disregard for Plaintiff's civil rights.

80. Plaintiff has suffered damages as a result of Defendant's unlawful actions.

## ENTITLEMENT TO RELIEF

81. As a direct and proximate cause of Defendant's actions described herein, Plaintiff has suffered a loss of enjoyment, emotional distress, embarrassment, humiliation, and mental anxiety, for all of which he should be compensated.

## PRAYER FOR RELIEF

82. WHEREFORE, Plaintiff prays that this honorable Court:

    (a) Declare the Defendant's conduct to be in violation of Plaintiff's rights;

    (b) That the Court enter an Order directing Defendant to alter its policies in order to make it facilities accessible to and useable by Plaintiff and other individuals who suffer from TS to the full extent required by the Kentucky Civil Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act;

    (c) Award Plaintiff in such amounts to be proven at trial any and all actual damages suffered for his loss of enjoyment, humiliation, embarrassment, personal indignity, apprehension, emotional distress, and mental anguish, all of which Defendant caused him by its illegal and discriminatory acts;

    (d) Award Plaintiff in such amounts to be proven at trial any and all compensatory, consequential, economic, and non-economic damages suffered;

    (e) Award Plaintiff interest, costs, and a reasonable fee for Plaintiff's attorneys of record;

    (f) Award Plaintiff any such legal and equitable relief as this Court may otherwise deem just and proper.

## JURY DEMAND

83. Plaintiff demands a trial by jury of all issues so triable.

                                      Respectfully submitted,

                                      <u>/s/P. Stewart Abney</u>
P. Stewart Abney
**ABNEY LAW OFFICE, PLLC**
1000 Cherokee Road
Suite 7
Louisville, Kentucky 40204
T: (502) 498-8585
E: stewart@abneylegal.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2023, a copy of the foregoing Plaintiff's First Amended Complaint was filed through the Court's electronic filing system, with service made electronically through that system to the following:

Jeffrey A. Calabrese
Amy L. Miles
Stoll Keenon Ogden PLLC
400 West Market Street, Suite 2700
Louisville, KY 40202
Phone: (502) 333-6000
jeff.calabrese@skofirm.com
amy.miles@skofirm.com
*Counsel for Defendant,*
*Bellarmine University Incorporated*

*/s/P. Stewart Abney*
*Counsel for Plaintiff*
